UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Trina L. Bender and Mark Bender,      :      Case No. 1:12-cv-956
                                       :
        Plaintiffs,                    :
                                       :
vs.                                    :
                                       :
Julie A. Logan, et al,                 :
                                       :
        Defendants.                    :

**ORDER**

Before the Court is Defendants' motion for summary judgment, seeking judgment
in their favor on all of Plaintiffs' claims. (Doc. 35) Also pending for a decision is
Plaintiffs' motion for partial summary judgment on their claim for unjust enrichment.
(Doc. 36) Both motions have been fully briefed. Defendants have also filed objections
to an order of the Magistrate Judge awarding Plaintiffs sanctions against Defendant
Scott Logan, arising from a discovery dispute. (Doc. 40)

For the following reasons, the Court overrules the objections to the award of
sanctions; grants in part Defendants' motion for summary judgment with respect to
Plaintiffs' federal securities claim only; and dismisses without prejudice Plaintiffs' state
law claims.

**FACTUAL BACKGROUND**

Trina Bender and her husband, Mark Bender, filed this action against Julie and
Scott Logan; Burg DMI, LLC, an entity owned by the Logans; the Julie Logan Revocable
Trust; and Elite Institute, Inc. The complaint alleges a claim under the federal securities
law and a panoply of state law claims, all arising from a failed business relationship

among the parties.

Trina Bender ("Trina") is a licensed cosmetologist and lives in Sciotoville, Ohio. Trina has owned and operated her own beauty salon for over ten years, and alleges that she has many contacts in the cosmetology industry. Mark Bender worked as a commercial truck driver for many years. Trina's ambition was to own and operate a state-of-the-art cosmetology school in Portsmouth, Ohio. This envisioned school would provide training and employment to local residents, and become a "showcase" business in Portsmouth. Defendant Julie Logan ("Julie") was a client of Trina's and a social acquaintance. Dr. Scott Logan, Julie's husband, is a physician. In addition to his medical practice, he and Julie invest in real estate. Julie worked for her husband's practice in the past, and ran a medical billing service for a few years.

Sometime in 2010, Trina talked to Julie about her dream of opening a school. Trina testified that she had previously talked to another client about a school, and that client had expressed interest in being a partner and helping to provide financing. Trina told the client that she was not ready for a partnership because she wanted to do it "on her own." (T. Bender Dep. at 51-52) Trina did some on-line research and spoke to people who worked at another local beauty school, and concluded that she could make good money running her own school. She did not investigate the finances of that other school, and assumed that she and Mark Bender could use the equity in their home to start a school. She never talked to a bank or tried to determine how much capital she would actually need, or might be able to raise on her own. Trina's salon was located in a mall, and she expressed to Julie a desire to find a more suitable location. That led to a discussion in which Trina talked to Julie about the school, telling Julie that "maybe I

was ready for a partner now." (Id. at 56)  Julie responded that she and her husband might be interested in being her partner.  Trina said that the day after this initial conversation, Julie told her "We're in.  Scott [Logan] wants to do it," and Trina and Julie immediately started looking at properties.  (Id. at 57)

The four principals (Trina and Mark Bender, Julie and Scott Logan) had a meeting at a local restaurant sometime in late 2010 to discuss the venture.  According to the amended complaint, during this meeting Julie told Trina that they would be "50/50 partners" in the school venture; and Scott Logan told Trina that he was either going to invest in "another million dollar beach house, or I'm going to invest in you." (Doc. 19 at ¶21)  Plaintiffs allege that all four principals agreed on a division of labor and responsibility for the new venture.  Mark Bender would be in charge of security, and renovating the building that would become the school.  Julie would handle finances and the business end.  Trina would design the school's curriculum and promote the school.  Scott Logan would provide the financing.  Trina and Julie would be equal partners and equal owners of a corporation to be formed for the venture.  (Id. at ¶22)  Scott Logan testified that from the outset, he made it clear to both of the Benders that if he was going to provide 100% of the financing, he and Julie would retain complete control over the school, and the decisions about the business finances.

Elite Institute, Inc. was formally incorporated on December 8, 2010, with Julie as the sole incorporator.  The articles of incorporation authorized the issuance of 500 shares of Class A common stock with exclusive voting powers, and 1,000 shares of Class B common stock with no voting power.  At a subsequent meeting between the four principals, which occurred sometime around February 15, 2011, a series of

documents were executed.  These documents include: (A) a subscription agreement for 50 Class A shares issued to Julie, and 50 Class B shares issued to Trina, for $1.00 per share, and which is signed by Julie and Trina; (B) an Action of Shareholders, appointing Julie and Trina as Directors of the corporation and authorizing the issuance of the stock, signed by Julie and Trina; (C) a written consent in lieu of first meeting of the directors, electing Trina as President and Julie as Secretary and Treasurer, and  authorizing the stock issuance, signed by both Julie and Trina; (D) two stock certificates, one to Trina for 50 shares of "Elite Institute, Inc., Class B nonvoting common stock", and one to Julie for 50 shares of "Elite Institute, Inc.", each certificate signed by both Julie and Trina; and (E) a stock purchase agreement between the shareholders (Julie and Trina) and Elite Institute, Inc., generally restricting stock transfers and giving Elite a right of first refusal for any sale of shares, signed by Julie and Trina as shareholders, and by Trina on behalf of Elite.  The corporate documents were prepared by a local attorney.

Trina admits that she signed each of these documents during the meeting.  She testified that she did not read any of them because she "trusted" the Logans.  Scott Logan testified that in various discussions with the Benders and with his attorney prior to this meeting, it was decided that issuing Class B stock "would be the best way of doing something to give [the Benders] the opportunity on the back end of things to recoup some profit sharing for their up-front sweat equity."  (S. Logan Dep. at 91)  At the February meeting, Scott Logan testified that he explained the contracts and the documents, and recalled that Trina and Mark Bender read them and Trina signed them during that meeting.  (Id. at 92)

At the February 2011 meeting, three separate employment contracts between

Elite and Mark Bender, Trina, and Julie, respectively, were also signed. Mark Bender's contract was for one year beginning on July 5, 2011 as Elite's Director of Operations, at an annual salary of $30,000. Trina's contract covered the same one-year period, and her title was General Manager to Program Director and Master Educator, at an annual salary of $30,000. Trina's contract entitled her to earn a bonus, payable in Elite's sole discretion, of 50% of Elite's annual net income, and it included a stock repurchase clause in the event that she left the company or was discharged for cause. Julie's title was "Lead Financial Aid/Admissions Officer," for the same one-year period at the same $30,000 salary, and with the same bonus and repurchase provisions that were contained in Trina's contract.

Trina alleges that the principals had agreed before the February 2011 meeting that the salaries for her and Mark Bender would be $60,000. She noticed during the meeting that the contracts stated their salaries would be lower ($30,000), and she asked the Logans about it. She alleges that Scott Logan assured her that it would be changed. She does not dispute that she signed the contract without indicating in any way on the face of the document that the stated $30,000 salary was an error. Mark Bender also signed his contract with the $30,000 salary clause and without indicating the purported error. Julie testified that the written contracts had been drawn based on their best estimates of when the school would actually open to students, and when it would begin to turn a profit. She said that these contracts were "... signed, put away, we all agreed verbally that nobody was going to get any money because the school wasn't even open. There wasn't any funds coming in [sic]. We all agreed that we got ahead of ourselves. We got excited and ahead of ourselves." (Julie Logan Dep. at 81)

Burg DMI, also named as a defendant in this case, is an LLC owned by Julie Logan.  This entity apparently holds title to some of the Logans' real estate investments.  Burg DMI purchased a building in downtown Portsmouth, and entered into a lease with Elite, under which Elite agreed to assume all costs for the property.  Julie signed this lease on behalf of both Burg DMI and Elite.  The property apparently needed extensive renovations and code-required improvements, and construction  began sometime in the spring of 2011.  Elite hired a contractor to perform most of the renovations.  Mark Bender testified that he and family members or friends assisted in that project.  The Benders' complaint alleges that Julie insisted that Mark Bender be on-site at the building during the renovation project, which required him to give up his job driving a truck and to sell his truck.

The school did not actually open to students until May 2012.  Scott Logan testified that the original financial projections included an  assumption that the school would be eligible for federal financial aid for its students after one year of operation.  He discovered later that the school could not even qualify for the necessary accreditation until it had been open for a minimum of two years, which eliminated a planned source of revenue.  No salaries were paid to Trina, Julie, or Mark Bender until sometime in the summer of 2012, when Mark Bender received a few sporadic payments totaling about $4,000.

Trina alleges that she cut back her hours at her own salon in order to fulfill her responsibilities to the school.  She also alleges that the Defendants exploited her name, likeness, and her cosmetology experience to promote the school.  By the summer of 2012, Trina became concerned about Julie's use of Elite's funds and inventory of

products.  She alleges that the Logans' daughters took products home without paying for them, and that Julie took products home that had been paid for by Elite.  Trina asked to meet with Scott Logan to discuss these concerns, as well as the fact that she and Mark Bender were not receiving salaries.  Scott Logan told her that the school had no funds to pay the Benders and had only enough to pay its instructors.   Scott Logan testified that Trina had asked to meet with him, and that she told him she was "somewhat disgruntled with how things were going at the school, and she was talking about the finances and things like that.   And I spoke frankly with her that she's the one who hired an excessive number of instructors, causing the overall costs, the operational costs of the school, to be excessively high."  (S. Logan Dep. at 35-36)  He told Trina that he was "tapped out.  I don't know that I can continue to dump this amount of money in."  (Id. at 36)  Scott Logan also testified that at this meeting, he talked to Trina about his request that she relinquish her Elite stock to the Logans and resign from the corporation, which would allow Scott Logan to claim Elite's losses for tax purposes, in order to offset the loans he made to Elite.

On July 28, 2012, Trina received a text message from Scott Logan, saying that he had paperwork that needed to be signed by Trina and Julie.  He described it as "nothing major.  Just left over stuff unsigned from 2011 business year and beginning of 2012."  (Doc. 19,¶ 42; the text message is Ex. 19 to Scott Logan's deposition.)  Trina alleges that when she went to the house, Scott Logan placed the documents in front of her and indicated where she needed to sign, while "covering up" the pages of the documents.  Trina signed the documents, and did not read them or question Scott Logan about what they were.  The two documents she signed were a written

Resignation as an Officer and Director of Elite, and a stock purchase agreement by which she agreed to sell her 50 Class B shares to Julie's revocable trust for $1.00 per share. The documents made these actions effective as of December 31, 2011. Trina alleges that she was fraudulently induced to sign these documents, because Scott Logan described them as "nothing major" rather than documents divesting her of her interests as an Elite director and shareholder. Scott Logan testified that his lawyer advised him that the documents Trina signed in July 2012 could be effective on an earlier date for tax purposes.

The amended complaint alleges that in mid-September 2012, Trina Bender reviewed Elite's bank account and some recent checks drawn on the account, and discovered a number of checks containing her forged signature, including some checks written to Julie. She alleges that each "co-owner" of Elite was required to sign each check written against this account. Trina told one of the school's instructors about her discovery. Then on September 26, 2012, Trina received a phone call from Elite's attorney, informing her that Julie wanted to dissolve the business, and offering Trina a sum of money to "walk away." Trina told the attorney that she did not want to give up her "50% ownership and 50% control" of Elite. (Doc. 19, ¶ 50)

On October 4, 2012, Trina received a letter from the attorney, which stated in part: "It has become apparent there are irreconcilable differences that have arisen between you and the corporation." The letter reiterated the proposed settlement and enclosed a written settlement offer. The letter further stated that if she refused to accept the offer, the corporation would be dissolved and she would be liable for one-half of the corporation's debt of approximately $500,000. During the dissolution of the

corporation, she would be required to pay one-half of the operating expenses shortfall, approximately $7,500 per month.  He further advised Trina that she was relieved of all of her responsibilities, and asked her not to return to the premises.  (Trina Bender Dep, Ex. 11)  Trina did not sign the proposed settlement agreement, and sought legal counsel.  At about the same time, Mark Bender received a similar letter, relieving him of his duties at Elite and asking him to sign a termination/settlement agreement.  He did not sign that document.

Trina and Mark Bender filed their original complaint in this case on December 13, 2012.  (Doc. 1)  Their amended complaint, filed on June 5, 2013, alleges federal subject matter jurisdiction based on a claim arising under the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5.  The amended complaint also includes state law claims for fraudulent inducement; unjust enrichment; conversion; civil conspiracy to commit fraud; a claim to "pierce the corporate veil" and hold Julie Logan personally liable to Plaintiffs; and a claim for punitive damages.  (Doc. 19)

## DISCUSSION

1.  <u>Defendant Scott Logan's Objections to Sanctions Order</u>

The Magistrate Judge's February 6, 2014 Order (Doc. 34) sets forth the background to the discovery dispute between the parties which preceded the Plaintiffs' motion to compel.  Briefly summarized: Defendant Scott Logan was deposed on May 1, 2013.  He was asked if he had ever prepared any budgets, projections, or forecasts for Elite at any time, and he answered "Yes. ... I prepared many over times [sic]. ... and built an Excel file."  (S. Logan Dep. at pp. 14, 16)  He said he had "no idea" where the Excel file was at that time, because normally he printed out documents, "doodled on

them, and then destroyed them." He explained that he would continually edit the Excel file (which was presumably on his computer) as more information was received. (Id. at 16) He was then asked if he had destroyed spreadsheets and projections since December of 2012 (when Plaintiffs filed this lawsuit), and he responded "Correct." When counsel asked why Logan did not give any budgets, projections, or forecasts to his lawyer for production to Plaintiffs in the case, he said "Because I don't have any." Counsel responded that he thought Logan had just testified that he kept the most current version on his computer, but Logan said he "did not have that."

Counsel then asked him to identify the computer he had used to create the file, and how he could go about locating that file. Logan responded that he would look for Excel spreadsheets by searching "Elite," and that there would be other documentation concerning Elite in his computer. (Id. at 18-19) Logan was later asked if had destroyed any emails, and he responded "Of course. I delete my email files regularly." (Id. at 20) At the end of the deposition, Plaintiffs' counsel stated that he intended "to leave the record open because I'm quite sure that the document production is not complete from Scott Logan, particularly with respect to the computer." (Id. at 149)

Following the deposition and a telephone conference with the court, the Magistrate Judge issued an order on June 3 to compel Scott Logan to permit Plaintiffs' computer expert to "image" the hard drive of his computer, subject to certain protections for HIPPA protected information. The Magistrate Judge specifically noted in her order that "Notwithstanding the necessity of a broader preliminary search **given the admitted deletion of relevant files**, the Court anticipates that only responsive and relevant

information ultimately will be retained by Plaintiffs for purposes of use in this litigation."
(Doc. 17 at 2-3, emphasis added.)

On July 9, Plaintiffs filed a formal motion to compel and for an award of
sanctions.  (Doc. 23)  They argued that their computer expert found little relevant
information on Logan's imaged computer.  But the expert discovered evidence strongly
indicating that relevant documents had been remotely stored from the computer on a
"cloud" server.  After the motion to compel was briefed, the parties attempted to mediate
all of their disputes.  The Magistrate Judge therefore denied the motion to compel
without prejudice to renewal if the parties were unable to resolve the case.  When that
proved to be the case, Plaintiffs timely renewed their motion to compel and for sanctions
on January 14, 2014.  (Doc. 31)

After expedited briefing, the Magistrate Judge ordered an award of sanctions
against Scott Logan.  She reaffirmed the statements in her previous June 3 order, that
Logan testified that he deleted relevant documents from his computer.  It was this
testimony that led to that initial order compelling Logan to allow his computer to be
imaged.  The imaging process then revealed the existence of other relevant documents.
And it was only after Plaintiffs filed their July 2013 motion to compel (renewed in
January 2014) that Dr. Logan, through his new co-counsel, produced hundreds of
additional pages of responsive, computer-generated documents.  The Magistrate Judge
concluded that sanctions were properly awarded pursuant to Fed. R. Civ. Proc.
37(a)(5), which provides that a court "must" award reasonable expenses and attorney's
fees when documents are produced after a motion to compel has been filed or has been
granted.  The amount of the sanctions was the amount Plaintiffs paid to their expert to

image the computer and study the results.

Defendant objects to the sanctions award. He notes that the Magistrate Judge's Order was issued without a hearing, which he suggests "led to a misunderstanding that led to the instant order." (Doc. 40 at 1) He suggests that Plaintiffs improperly or imprudently "convinced" the Court to permit the forensic examination and imaging of his computer, an examination he contends was based upon a mistaken belief that he had deleted financial documents. The forensic examination did not locate any responsive documents, and he therefore suggests that the Magistrate Judge's observation that his initial document production was "woefully inadequate" is plainly wrong. He also notes that in his deposition, he truthfully stated that the financial projections for Elite were given to the bank in connection with the loan application, and that Plaintiffs eventually obtained the documents from that source. And he claims that the majority of the emails that were eventually recovered and produced were Plaintiffs' emails, none of which he believes are material to the case.

Fed. R. Civ. P. 72(a) provides that when a party objects to an order of a Magistrate Judge in a nondispositive matter, the district court must modify or set aside any part of the order that is clearly erroneous or contrary to law. Defendant suggests that the Magistrate Judge failed to address the factors articulated in <u>Zubalake v. UBS Warburg, LLC</u>, 216 F.R.D. 280 (S.D.N.Y. 2003), concerning costs of "expensive computer searches" and production of ESI. The Court disagrees that this amounts to an error of law, or requires vacating the Magistrate Judge's order. Dr. Logan's deposition testimony clearly leaves a reader with the understanding that information relevant to Elite was kept in an Excel spreadsheet and/or Excel file on his computer.

While he explained that he did not keep the printed copies of any Excel documents, he clearly testified that if he wanted to find the Excel computer file, he would type in "Elite" and search the computer. He apparently did not do so when he initially produced documents responsive to Plaintiffs' discovery requests. He also stated rather clearly that he had deleted emails and other documents after December 2012. Defendant did not correct or amend this answer in his deposition errata sheet, and did not object to the Magistrate Judge's statement in her June 2013 Order (Doc. 17) that a broader preliminary search was necessary "given the admitted deletion of relevant files." Only when new co-counsel appeared and filed a response to the formal motion for sanctions did this contention arise. Defendant also suggests that the only document that could be relevant to this case is the financial projection that was given to the bank. But the questions posed to Defendant in his deposition were not limited to that document, as the questions concerned any and all documents relevant to Elite that were on Defendant's computer.

Nor can the Court conclude that the Magistrate Judge's order or any of her findings are clearly erroneous. A Magistrate Judge's factual findings are clearly erroneous if, after review of the entire record, the district court reaches the "definite and firm conviction that a mistake has been committed." <u>Sanford v. Harvard Indus.</u>, 262 F.3d 590, 595 (6th Cir. 2001)(internal citation omitted). Defendant suggests that there was no "smoking gun" document found among those that he produced in September 2013, after Defendant's computer was imaged and after the motion to compel was filed. But the lack of a "smoking gun" document does not control whether sanctions are appropriate. Rule 37(a)(5) mandates an award of reasonable expenses unless the

court finds that: "(I) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;  (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust."  Based on the entire record, the absence of a "smoking gun" document does not justify Defendant's original nondisclosure, nor make an award of expenses in this case unjust.  It was Defendant's own testimony at his deposition that led to the imaging and the subsequent motion to compel.  And he does not deny that after that motion was filed, he produced a quantity of additional responsive documents. The lack of a "smoking gun" among them does not excuse this conduct.

For these reasons, the Court overrules Defendant Scott Logan's objections to the Magistrate Judge's order awarding sanctions against Defendant in the amount of $6,613.06

2.    Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a

lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir.

1992).  Rather, the burden is on the non-moving party to "present affirmative evidence

to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford

& Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in

dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts."  Matsushita

Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court

construes the evidence presented in the light most favorable to the non-movant and

draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc.,

369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S.

at 249.  The court must assess "whether there is the need for trial — whether, in other

words, there are any genuine factual issues that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party."  Id. at

250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court

may grant judgment."  Anderson, 477 U.S. at 249-50 (citations omitted).

3.    Federal Securities Claim

Defendants' motion seeks entry of judgment on all of Plaintiffs' claims.  The Court

will first address Count One, the federal securities claim, which is the basis for this

Court's subject matter jurisdiction.  To state a claim for relief, plaintiff must allege that, in

connection with the purchase or sale of securities: (1) the defendant made a

misstatement or omission of a material fact, (2) that was made with scienter, (3) upon

which plaintiff justifiably relied, and (4) which proximately caused plaintiff's loss. Hoffman v. Comshare, Inc. (In re Comshare Inc. Sec. Litig.), 183 F.3d 542, 548 (6th Cir. 1999).

Plaintiffs' securities claim is ostensibly brought by both Plaintiffs. But Trina alone received and sold the Elite stock shares, and she alone has standing to pursue this claim. And while the amended complaint alleges that "the Defendants" made various misrepresentations, Plaintiffs specifically allege in Count One that Scott Logan and Julie Logan made false representations and/or factual omissions with respect to the Elite stock. Defendants correctly note that there are no allegations against Burg DMI, the Julie Logan Revocable Trust, or Elite Institute with respect to this claim. The Court concludes that these three Defendants are entitled to judgment on this claim, because none of these entitles made a misstatement or omission with respect to Trina's purchase or sale of Elite stock.

Loss causation is a required element of this claim. Trina must establish  a causal link between the alleged misrepresentation or omission and her resulting economic loss. Defendants contend that Trina has not shown that she sustained any actual loss in connection with the Elite stock. Trina paid nothing for her initial 50 Class B shares, and suffered no loss at that time. When Trina sold her shares to Julie's trust for $1 per share, the stock had no value and she sustained no measurable loss. In securities fraud cases, actual damages are typically measured by the difference between what the plaintiff paid for the security and the true value of the security at that time, absent the misrepresentation or omission. See generally, Dura Pharms. v. Broudo, 544 U.S. 336, 343-345 (2005). Trina's "dream" of owning or co-owning a school lacks real or

measurable economic value for purposes of establishing her claim in this case.

Plaintiffs respond that Trina suffered substantial losses, including the value of 22 months of "sweat equity" she put into Elite. She claims to have lost the market value of her shares at the time she sold them, and she incurred costs to move her own salon to Portsmouth in order to be closer to the school. But Trina offers no evidence on market value, or the costs to move her salon. Plaintiffs have proffered an affidavit from Letha Barnes, who has many years of experience in the cosmetology field. (Doc. 36, Ex. G) Ms. Barnes opines that cosmetology schools with an average of 100 or more students have an annual income of at least $700,000. This opinion is based upon her own survey of a small group of unnamed schools in different states. She also submits projections of Elite's anticipated growth and income for a period of eight years going forward, based on stated assumptions about the number of enrolled students, the tuition charged and collected, and other sources of income. In the first year, Ms. Barnes opines that Elite would have an annual income of $782,000, and in years two through five of operation an annual income of over $1.9 million. Plaintiffs also proffer a report from Dr. Harvey Rosen about their projected future economic loss. Dr. Rosen's opinions regarding the present value of the school's future income and value are largely based upon Ms. Barnes' income projections.

Defendants raise several objections to Ms. Barnes' opinions, including that her assumptions are not supported by any facts in the record that are relevant to Elite. The Court agrees. There is no evidence about the number of students that actually enrolled in the school, the amount of revenue collected in the first year, or whether the school had other sources of income other than tuition. There are no facts to support her

opinion that Elite's income in the first year was anything close to $782,000.  But even if

her projections of future revenues may have some validity, Trina does not allege that

either Julie Logan or Scott Logan made any specific representations to her about the

potential profitability of the school or the potential value of Elite stock in order to induce

her to become a shareholder or director of the corporation.  Plaintiffs do not identify any

specific representations about any remuneration she might receive as a director or

officer of the corporation.  All four principals undoubtedly embarked on the venture with

the goal of making money and turning a profit.  But Trina's subjective anticipation of

eventual financial success is not sufficient to show that Trina suffered a cognizable

economic loss at the time that she received her Elite shares or when she sold them.

Ms. Barnes' unsupported opinions of future income and revenue are not sufficient to

satisfy the requirements of loss causation.  In reaching this conclusion, the Court

expresses no opinion as to whether Ms. Barnes' opinions might be admissible or

relevant to any of Plaintiffs' common law claims.

Defendants also argue that there is no evidence of scienter.  The Supreme Court

has defined "scienter" as a "mental state embracing intent to deceive, manipulate or

defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976).  Trina received 50% of

the issued shares in Elite without paying anything for them.  Defendants contend (and

Plaintiffs do not dispute) that Scott Logan injected approximately $2 million into the

company through the summer of 2012.  Trina sold her shares in July 2012 at no out-of-

pocket loss to her, and she does not dispute Defendants' contention that the stock had

no measurable value at that time.  Defendants argue that no reasonable inference of an

intent to deceive or defraud arises from these facts.  Trina responds that Julie knew that

Trina wanted to be a "50/50" partner with 50% control of Elite. Despite that knowledge, Julie incorporated Elite with two share classes, intending from the start to exclude Trina from equal control. Then Scott Logan deceived her into signing the July 2012 documents, because he wanted to claim the full tax benefits of Elite's losses.

With respect to materiality, Trina alleges that Defendants misrepresented her real ownership and did not tell her that her Class B shares were non-voting. Defendants reject this assertion, citing Trina's testimony that she would have signed the initial corporate documents even if she had read them, which strongly suggests that the non-voting nature of the stock was not material to her. Nor was the alleged omission material to the representation that Trina would "own" 50% of the business. Trina testified that she believed "50% of the company" meant to share control, share profits, and share responsibilities. (Trina Dep. at 87) Trina in fact owned 50% of the outstanding shares, she was President of the company, and she was one of two directors. If any profits had been achieved, she would have been entitled to her share of them. It is unclear to the Court how the fact that she received Class B non-voting stock is material to the alleged misrepresentation of "50/50" ownership.

But even if the statement was material, Defendants further contend that Trina has not established that she reasonably and justifiably relied upon any material omission concerning the non-voting nature of her shares. Any reliance she may assert is clearly not justified, because the corporate documents that she admits she signed disclosed the nature of her stock and her role in the corporation. She had the opportunity to read the documents but admits that she did not do so.

The Court agrees that Trina has not established that she was justified in relying

upon any oral representation or omission by Julie or by Scott Logan. Trina admitted

that during the meeting in February 2011, she signed the corporate documents and did

not read them. If she had read them, she would have seen that the Subscription to

Shares document issued 50 "Class A" shares to Julie, and 50 "Class B" shares to her.

The subscription specifically cross-references the stock certificate evidencing ownership

of those shares, which she also signed and which plainly stated that her shares were

"Class B non-voting common stock." If she had read the Action of Shareholders, she

would have seen that she and Julie, as shareholders, were formally accepting the

Articles of Incorporation and the appointment of Julie as statutory agent, as set forth in

the initial articles that Julie, as the sole incorporator, filed with the Secretary of State of

Ohio. The Action of Shareholders also ratified and approved Julie's actions as the sole

incorporator, and authorized the shares of stock that each of them received.

Trina also signed the Written Consent in lieu of First Meeting of the Board of

Directors. The first resolution on that document states that the directors have reviewed

and approved the Certificate of Incorporation filed with the Secretary of State on

December 10, 2010. That document plainly described the issuance of two classes of

stock. On page two of the Written Consent, it again plainly discloses that Julie

subscribed to 50 Class A shares, and Trina to 50 Class B shares. In addition, Trina

signed the Stock Purchase Agreement which clearly identified the number and type of

shares being issued to Julie and to Trina.

For purposes of a Section 10(b) claim, a plaintiff's reliance must be both

reasonable and justifiable. See, e.g., Kline v. First W. Gov't Sec., Inc., 24 F.3d 480,

487-488 (3d Cir. 1994). If a plaintiff had information available to her that would have

revealed an alleged fraud or factual misstatement, that availability negates an assertion of justifiable reliance. In <u>Brown v. Earthboard Sports USA, Inc</u>., 481 F.3d 901, 920-921 (6th Cir. 2007), the Sixth Circuit held that a "contextual analysis" must be undertaken to determine if a party has introduced sufficient evidence of reasonable reliance to withstand summary judgment. That case arose from an investment contract that included the investor's specific acknowledgment that he was not relying upon any extra-contractual representations, but he invested in the company on the basis of such representations. That specific scenario does not apply here. But some of the factors articulated by the court in undertaking that "contextual analysis" to evaluate reliance are relevant here, including the sophistication of plaintiff; whether there is a long standing relationship between the parties; plaintiff's access to relevant information; concealment of the alleged fraud; whether the plaintiff initiated the transaction; and the specificity of the alleged misrepresentations. See also, <u>Nolfi v. OKO Corp.</u>, 675 F.3d 538, 548 (6th Cir. 2012).

Trina Bender graduated from high school and attended college for two years, and she has operated an apparently successful salon business for over ten years. While she may lack knowledge of corporate law, the documents she signed were not unduly complicated such that she would not have understood the import of what she was signing if she had chosen to read them. Specifically, the documents plainly disclosed that there were two classes of stock, and that Julie was receiving a different class than Trina. There was no concealment of any fraud regarding the shares. Trina concedes that she could have read the documents, and nothing prevented her from doing so. Many courts addressing a variety of fraud-based claims have held that a party cannot

close her eyes to the terms of a contract she signs, or claim fraud when an agreement she voluntarily signed clearly discloses its terms.  See, e.g., <u>ABM Farms, Inc. v. Woods</u>, 81 Ohio St.3d 498, 500 (Ohio 1998), enforcing an arbitration clause in a brokerage account agreement signed by "an admittedly unsophisticated farmer who wants her day in court." See also, <u>Stout v. J.D. Byrider</u>, 228 F.3d 709, 715 (6th Cir. 2000)("one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions."); <u>EP Medsystems, Inc. v. Echocath, Inc</u>., 30 F.Supp.2d 726, 757 (D.N.J. 1998)(failure to read available documents that contradict the alleged misrepresentation negates reliance).  Trina's securities fraud claim based on the issuance of Elite stock fails because she has not established that she reasonably and justifiably relied upon any material misrepresentation or omission.

The second transaction involving Elite's stock was Trina's July 2012 sale of her 50 Class B shares to Julie's revocable trust.  By this time, Trina had been involved with Elite and the Logans for almost two years.  She testified that she had a meeting with Scott Logan in June 2012 because she was unhappy about the school's finances, at which point Scott Logan told her that he was "tapped out."  Shortly after this meeting, Trina signed the two documents (her resignation and the stock transfer agreement) that Scott Logan presented to her, and did not read them.  While she testified that Scott Logan told her where to sign and "covered up" the text, she does not claim that he prevented her from reading them.  Nor does she claim that she asked any questions about the documents.  These documents were not complex.  If she had read them, the Court has no doubt she would have understood what they said.  For the same reasons discussed above with respect to her initial subscription, Trina has not established that

she justifiably relied upon any representation made by either of the Defendants with respect to the second securities transaction.  In addition, as discussed above, she has not shown that she suffered an actual economic loss as a result of the sale of her stock shares.  Her subjective anticipated future benefit to be gained from owning that stock or being a director of the corporation are not sufficient to show that she realized an actual loss from the sale of the stock.

For all of these reasons, the Court concludes that Trina Bender has not established the requisite elements of a federal securities law claim under 15 U.S.C. §78 or Rule 10b-5.   Defendants are therefore entitled to entry of summary judgment on that claim.

4.    Plaintiffs' State Law Claims

As noted at the outset, Plaintiffs' amended complaint alleges a host of state common law claims against the Defendants.  They allege federal subject matter jurisdiction over all of their claims.  15 U.S.C. §78aa grants exclusive federal jurisdiction over federal securities claims.  The Court may of course exercise supplemental jurisdiction under 28 U.S.C. §1367 over state claims that are related to a federal claim. But that statute specifically authorizes the Court to decline such jurisdiction when the state law claims substantially predominate, or when the court has dismissed all federal claims.

The Court finds that Plaintiffs' various state law claims are far broader than Trina Bender's federal claim, and would require the application of particular Ohio law principles to the many remaining factual disputes between the parties.  This Court has dismissed the only federal claim alleged.  The Court therefore declines to exercise

supplemental jurisdiction over the balance of Plaintiffs' claims, and they are dismissed

**without prejudice**.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: June 3, 2014                           s/Sandra S. Beckwith
                                              Sandra S. Beckwith, Senior Judge
                                              United States District Court